**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| SALTA GROUP, Inc., ) | |
| ) | |
| Appellant, ) | No. 06-1194 |
| ) | |
| v. ) | |
| ) | |
| LONNIE E. McKINNEY, ) | |
| ) | |
| Appellee. ) | |

**O P I N I O N   A N D   O R D E R**

Before the Court is Appellant, Salta Group, Inc.'s appeal from the Bankruptcy Court's Opinion of May 17, 2006. Therein, the Bankruptcy Court denied Salta's objection to confirmation of Lonnie E. McKinney's Amended Chapter 13 Plan. For the following reasons, the well-reasoned decision of the Bankruptcy Court is AFFIRMED.

**I.**

**BACKGROUND**

Lonnie McKinney owns and resides in a two unit duplex located in Peoria Illinois (the "duplex"). He is a disabled veteran and lives on $846 per month from a Veterans Administration disability pension and $250 per month in rent from the second unit in the duplex. At the end of 2001, McKinney failed to pay his 2001 real estate taxes levied against the duplex.

Peoria County has an annual tax sale where delinquent taxes are sold to members of the public.  Typically, delinquent tax sales allow county governments to more efficiently collect unpaid taxes.  Roger M. Young, <u>An Overview of Real Property Tax Sales in South Carolina</u>, 11-OCT S.C. Law. 25, at 26 (September/October 1999).  Under the Illinois tax sale process, public investors can purchase specific individual's delinquent taxes at a county tax sale.  The process essentially works as follows:  An investor attends the tax auction and bids on delinquent taxes.  However, the investor does not bid a purchase price.  Instead, he bids an interest rate or "penalty rate" and whichever investor bids the lowest interest rate wins that auction.  He then pays the county the exact amount that the delinquent property owner owes the county plus costs.  Over the next two years, if the delinquent property owner would like to keep his property, he must pay the amount owed in delinquent taxes plus the penalty rate which was set by the investor's bid at the auction.  If the delinquent property owner pays off his debt, the tax purchaser will see a return on his investment equal to the set penalty rate minus any costs.  It is important to note that if the property owner wants to pay his delinquent taxes and keep his property he does not pay the tax purchaser directly.  Instead, he pays the county his delinquent taxes plus the penalty rate, and the county essentially passes that money

on to the tax purchaser.  If however, the property owner does not redeem his unpaid taxes, and the period of redemption expires, the tax purchaser can obtain a deed to the property. Once the redemption period has expired and the tax purchaser has provided notice, the tax purchaser can eventually acquire an interest in the property from an Illinois court in the form of a tax deed.[1]

In the case at bar, Peoria County sold McKinney's delinquent taxes to Salta in 2002.  On April 21, 2005, Salta filed and served upon McKinney, a statutory "Take Notice" advising McKinney that the duplex had been sold for delinquent taxes, that the period of redemption would expire on September 1, 2005, that a petition for issuance of a tax deed had been filed, and that a hearing on the petition would be held on September 19, 2005 in Peoria County Circuit Court.  [Appellant Brief at 12.]

On August 31, the last day of the redemption period, McKinney filed a Chapter 13 Petition for Relief in the United States Bankruptcy Court in the Central District of Illinois.  In

---

[1] For additional information regarding this tax sale process see any of the following sources:  Arthur W. Friedman, <u>Tax Sales and Tax Deeds – A Primer</u>, 18-May CBA Rec. 38, (May 2004); Peoria County Treasurer: Delinquent Tax Information, http://www.peoriacounty.org/treasurer/deltax (last viewed November 1, 2007); 35 ILCS 200/21-190 - 21-255.

the bankruptcy filing, McKinney listed Salta as a creditor that was owed $5,786.66 in unsecured priority debt.

McKinney filed an Amended Chapter 13 Plan on September 16, 2005 proposing to cure the debt owed in delinquent taxes, plus interest, in installments over the term of the amended plan.  On September 19, 2005, the Clerk of the United States Bankruptcy Court prepared a notice to creditors, including Salta, which informed the creditors of the order for relief, the meeting of creditors, the time fixed for a Chapter 13 plan confirmation hearing and for filing claims.  However, the notice was not mailed to Salta until September 21, 2005.

Also on September 19, after the expiration of the redemption period - but before Salta received notice of McKinney's bankruptcy filing, Salta filed its application for issuance of a tax deed for the duplex.  The Circuit Court of Peoria County entered an order directing the issuance of a tax deed conveying the Real Estate to Salta.  [Appellant's Brief at 13.]

On November 14, after Salta received the notice from the United States Bankruptcy Court, Salta filed its Objection to Confirmation of McKinney's Chapter 13 Plan on the grounds that it was not a creditor of McKinney's estate and the duplex was no longer property of McKinney's estate.

The Bankruptcy Court issued an Order finding that the state court order issuing the tax deed to Salta was void. Specifically, the Bankruptcy Court used the automatic stay provision of 11 U.S.C § 362(a) which provides that creditors may not pursue satisfaction of claims or enforcement of liens while a bankruptcy case is pending and held that Salta could not enforce their claim against McKinney's bankruptcy estate by obtaining a tax deed. The Bankruptcy Court later issued an Order denying Salta's objection to confirmation of the Amended Plan.

Salta originally appealed the denial of their objection to the Seventh Circuit Court of Appeals. However, the Seventh Circuit refused to accept a direct appeal. As a result, this Appeal is now before this Court.

## II.

## LEGAL STANDARD

In a bankruptcy appeal, questions of law are reviewed *de novo*, and findings of fact are reviewed for clear error. In re ABC – Naco, Inc., 483 F.3d 470, 472 (7th Cir. 2007). Neither party disputes that the issues before the court are questions of law entitled to *de novo* review.

## III.

## ANALYSIS

The Bankruptcy Court modified Salta's ability to obtain payment of the delinquent taxes through 11 U.S.C. § 1322 of the

5

bankruptcy code.  Section 1322 allows a debtor to modify the rights of creditors in a Chapter 13 bankruptcy plan.  In addition to stating that the plan shall provide for the full payment of certain claims, § 1322 also states that "...the plan may... modify the rights of holders of secured claims...."[2]  11 U.S.C. § 1322(b)(2).  The Bankruptcy Court noted in its opinion that this section of the statute contains "the most fundamental and powerful tool that a debtor possesses."  In practice, this section allows a debtor to submit a plan which will extend her repayment terms and reduce her monthly payments for secured claims.  Essentially, for the cost of filing bankruptcy, the debtor is able to create a more manageable repayment schedule for certain debts.  However, this "powerful tool" is not an omnipotent tool.  Under 11 U.S.C. § 1325, unless the creditor agrees, the plan must pay the value of a claim in full with interest over a term not to exceed five years.

---

[2] One could argue that McKinney could not alter Salta's right to obtain a tax deed because of additional restrictions in § 1322. Under § 1322, a bankruptcy plan cannot modify a secured claim where the claim is "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2).  However, Salta does not argue that they have a security interest in McKinney's principal residence because their claim to the duplex is not a "security interest."  A security interest is defined as a lien created by an agreement, 11 U.S.C. § 101(51), and Salta does not have a lien on the duplex created by an agreement.  Instead, Salta, as a tax buyer, has their claim secured by statutory rights rather than a security interest.  As a result, the power to modify Salta's claim is not limited by the additional restrictions encoded in § 1322.

In the case at bar, the Bankruptcy Court held that while a tax buyer has a right to be paid in full before the redemption period expires, under § 1322(b)(2) and § 1325 that right may be modified to allow the claim to be paid over the term of the bankruptcy plan. As a result, McKinney gets to pay back his delinquent taxes over the course of the bankruptcy plan and Salta does not get a deed to the property.

Salta argues that this holding runs contrary to 11 U.S.C. § 108(b) which states as follows:

> "...[I]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> >
> > (2) 60 days after the order for relief."

Based on § 108(b), Salta argues that under "applicable non-bankruptcy law," McKinney was faced with "a fixed period" within which to pay off his delinquent taxes. As a result, the "trustee,"[3] or in this case the bankruptcy plan, must provide for

---

[3] McKinney does not argue that section 108(b) only applies to a "trustee." While the literal text of § 108(b) only governs the actions of a "trustee," in a Chapter 13 context, § 108(b)

7

payment to Salta before sixty days after the order of relief entered on September 19, 2005.

Thus, on its face it appears as if this Court is confronted with two conflicting statutes.  Under §§ 1322 & 1325 McKinney can pay off his delinquent taxes over a five year bankruptcy plan.  On the other hand, under § 108(b) McKinney only has sixty days to pay off his delinquent taxes.  Luckily, there are several cases that provide guidance on how to address a tax buyer challenging a bankruptcy plan.  Unfortunately, many of the cases conflict with each other and our Appellate Court has not yet reached a definitive holding on the subject.

In support of their argument, Salta points to a number of cases that have not allowed a debtor to have an extended repayment bankruptcy plan for delinquent taxes.  In re Milne, 185 B.R. 280 (Bkrtcy. N.D.Ill. 1995), is the oldest such case relied upon by Salta and has a slightly different view of the subject matter.  According to the Milne court, when an investor purchases delinquent taxes at a tax sale he becomes the owner of the property.  At the tax sale the investor obtains a "Certificate of Purchase" that gives him ownership of the

---

applies to a debtor like it would normally apply to a trustee. Under Chapter 13, the debtor is allowed to remain in possession of his property and retains the rights that would normally pass to a trustee in a bankruptcy filed under a different chapter. As a result, § 108(b) is not limited to a "trustee" in this case.  In re Murray, 276 B.R. 869, 874 (N.D. Ill. 2002).

8

property subject to the previous delinquent owner's right of redemption. According to the Milne court, the debtor already forfeited ownership of the property when she failed to pay her taxes before the tax sale. The delinquent debtor is only in possession of a right to redeem the property. If she is able to obtain the funds to pay off the delinquent taxes before the end of the redemption period then she can reacquire the property, but until then she is not the "owner." It follows then that the delinquent debtor does not "owe" the tax purchaser anything, and as a result, the tax purchaser is not a creditor to the bankruptcy proceeding. The bankruptcy court then cannot unilaterally extend the redemption period because the tax purchaser is not a creditor to the debtor's estate.

A later bankruptcy court decision took a different point of view. In re Bates, 270 B.R. 455 (Bkrtcy. N.D. Ill. 2001), disagreed that a tax purchaser became the "owner" of the property in dispute at the tax sale. Instead, Bates looked to the analysis provided in two Supreme Court decisions to conclude that the tax purchaser was a creditor with a claim over the bankrupt property owner's estate.

As in this case, in Bates the court relied upon the automatic stay provision of 11 U.S.C. § 362(a). § 362(a) provides that a creditor may not pursue "satisfaction of claims" while a bankruptcy case is pending. Thus, in Bates, the

9

relevant issue was whether or not the tax purchaser had a "claim" over the bankruptcy proceeding. The Bates Court first noted that the Bankruptcy Code employs "the broadest available definition of 'claim'...." Bates, at 462; (citing Johnson v. Home State Bank, 501 U.S. 78, 83 (1991)). Then, the Court explained that when determining whether a party has a "claim" in a bankruptcy proceeding, the focus is not on the technical status of the parties, but instead on the consequences to the debtor for nonpayment. Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552 (1990). In tax cases such as this, the eventual consequence of nonpayment is that the owner will loose his property. Even though the property owner has no direct personal obligation to pay, the "substantial threat" of losing all equity in a home gives the investor a right to repayment. Bates, at 463-464; Davenport, 495 U.S. 552 (Defining nonrecourse mortgages as "claims," not because of the technical status of the mortgagee, but because of the consequences to the debtor for nonpayment). Because this "substantial threat" of losing her property hangs over the property owner, the investor is, for all intensive purposes, acting as a creditor to the bankruptcy estate.

By stepping back and looking at the tax purchasing process, it becomes clear that a tax purchaser should be viewed as a creditor to the bankruptcy estate rather than an owner of the

property.[4]  In Milne, the court viewed a tax purchaser as a "homebuyer" that owned the property subject to a right of redemption.  However, it is hard to imagine that an individual seeking to buy a home would go to a delinquent tax sale to obtain a fee simple over a property.  It would be at least two years before the "homebuyer" could obtain a deed over the property, and for those two years, the delinquent property owner could redeem his delinquent taxes at any point.  Furthermore, even after obtaining a tax deed two years later, this "homebuyer" would only have a tax deed subject to any interests or liens which third parties might have over the property.  As a result, it is evident to this Court that a delinquent tax purchaser is not acting as a homebuyer.  Instead, the tax purchaser is acting as an investor whose primary intention is to obtain a return on his investment through a penalty interest rate.  The axe that he hangs over the delinquent property owner is the threat of losing her property if she does not pay the delinquent taxes.  Thus, even though payment may go through the County, because of the substantial threat of taking the property, the investor should not be viewed as the "owner" of

---

[4] Salta even acknowledged in their brief that "the certificate of purchase does not initially affect the delinquent property owner's legal or equitable title to the property…" under Illinois law.  [Appellant Brief at 24.]

the property, but should instead be viewed as a creditor with a claim against the debtor's estate.

However, this does not end the analysis. As already noted, § 108(b) states that a "if applicable nonbankruptcy law ... fixes a period within which the debtor ... may ... cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, ... the trustee may only ... cure or perform ... before ... 60 days after the order of relief." According to Salta, under Illinois nonbakruptcy law, McKinney was faced with a fixed period within which to cure a default and redeem his delinquent taxes. McKinney filed for bankruptcy before the expiration of that redemption period so now the Bankruptcy Court can only extend the period for him to cure his default for sixty days.

To support their argument that § 108(b) should limit McKinney's bankruptcy plan, Salta points to In re Murray, 276 B.R. 869 (Bkrtcy. N.D. Ill. 2002), Smith v. Phoenix Bond & Indem., 288 B.R. 793 (N.D. Ill. 2002) and S.I Securities v. Dabal, 2003 WL 21785625 (N.D. Ill. 2003). In each of these cases, a court held that a delinquent property owner could not pay off his delinquent taxes over the course of a Chapter 13 bankruptcy plan. Specifically, the courts turned to § 108(b) and held that the sixty day limit applied and the debtor only

had an additional sixty days to pay his taxes and interest and redeem his property.

In the case at bar, the Bankruptcy Court acknowledged these cases yet held that the reasoning in <u>Bates</u> was more persuasive. This Court agrees.  <u>Bates</u> emphasized that § 108(b) only limited the extension of a nonbankruptcy right.  According to <u>Bates</u> "nothing in § 108(b) transforms the extension of a non-bankruptcy right into a negation of bankruptcy rights specifically accorded elsewhere in the Code."  Under this view, by enforcing the automatic stay, a bankruptcy court is not extending the period of redemption but simply enforcing bankruptcy rights that are allowed under Chapter 13.  The Seventh Circuit made it clear in <u>Moody v. Amaco Oil Co.</u>, 734 F.2d 1215 (7th Cir. 1984), that this is the appropriate way to view § 108(b).  There, the Seventh Circuit ruled that § 108(b) could not limit the right to cure executory contracts specifically accorded by 11 U.S.C. § 365.  Specifically, the Seventh Circuit noted that "[t]he purpose behind § 108(b) is to permit the debtor an extension of time for doing certain acts necessary to preserve his rights.  It would be anomalous to apply it to restrict debtors' rights...."  <u>Moody</u>, 734 F.2d at 1214-1215.[5]

---

[5] Salta focuses upon the fact that the Bankruptcy Court stated that § 108(b) "has no role to play in the Chapter 13 process"

13

Finally, Salta relies upon one Seventh Circuit decision which applied § 108(b) in a slightly different context. In In re Tynan, 773 F.2d 177 (7th Cir. 1985), a mortgagor filed for Chapter 13 bankruptcy after a judgment of foreclosure was entered and the mortgagor lost her property at a sheriff's sale. Under Illinois law, the mortgagor could redeem her property within six months after the sale by paying the purchase price plus interest. On the last day of the redemption period, the mortgagor filed for Chapter 13 bankruptcy and sought to have her redemption period extended so that she could pay off the mortgage over the course of her bankruptcy plan. The Seventh Circuit relied upon § 108(b) without addressing their previous reasoning laid down in Moody. The Court applied § 108(b) to the debtor and stated that "when a petition in bankruptcy is filed before the expiration of the applicable state redemption period, § 108(b) extends the redemption period for 60 days from the commencement of bankruptcy proceedings." Tynan, 773 F.2d at 179. However, any extension beyond the sixty day period was an "impermissible creation of a property right." Id. at 180.

---

and devotes considerable arguments toward disproving this statement. While the Bankruptcy Court semantically overreached when making this broad statement, the statement clearly does not form the crux of the Opinion. The point of the Bankruptcy Court's opinion is that § 108(b) does not act as a cut off limiting a debtor's rights. A complete reading of the Opinion reveals that the Bankruptcy Court still believes that § 108(b) has a role to play. However, that role is limited to extending rather than limiting a debtor's rights.

However, it is important to note that unlike in this case, the debtor in <u>Tynan</u> was not able to obtain any relief without § 108(b). In <u>Tynan</u>, the Court specifically determined that § 1322 did not apply to the debtor. The Court concluded that after the foreclosure sale, the debtor no longer "owned" the property and as a result the new owner was not a creditor to the bankruptcy.[6] Without § 108(b) the debtor was not allowed to pay off the value of her property over a five year period and with § 108(b), the debtor was only granted an additional 60 days to pay off the value of her property. Accordingly, the ruling in <u>Tynan</u> does not actually conflict with the ruling in <u>Moody</u>. That is to say, the Court in <u>Tynan</u> did not use § 108(b) as Salta would have this Court use it in this case – namely as a tool to restrict the debtor's rights. Such a use was specifically forbidden by <u>Moody</u> and described as "anomalous" to the purpose of § 108(b). <u>Moody</u>, 734 F.2d at 1214-1215.

---

[6] It makes sense that a buyer at a foreclosure sale would become the new "owner" of the property while a tax buyer does not become the new "owner." A buyer at a foreclosure sale is bidding a purchase price and the old owner looses her right of redemption in six months. A tax buyer on the other hand, does not pay a purchase price, but instead only pays the delinquent taxes and is bidding a penalty interest rate and must wait two years to obtain a tax deed and must give additional notice. Accordingly, a tax buyer is more likely to act as an investor seeking a return through a penalty interest rate, while a foreclosure buyer is more likely to seek a fee simple over a property.

To fully understand the purpose of § 108(b), it is important to look at the statutory history, which was relied upon extensively in this case by the Bankruptcy Court. Section 108(b) is the statutory descendant of § 11(e) of the Bankruptcy Act as amended in 1938. 2 Collier On Bankruptcy ¶ 108.LH[1]. Like § 108(b), § 11(e) specifically allowed a trustee to take certain actions to preserve the rights of the debtor's estate. And, § 11(e) specifically stated that these actions should be taken "for the benefit of the estate." Courts seemed to universally agree that § 11(e) was to be applied as a grace period which allowed a trustee to preserve the rights of the estate where the ultimate purpose of the bankruptcy was liquidation. However, when the purpose of the bankruptcy was rehabilitation of a going business, § 11(e) did not act as a cut-off forcing the debtor to comply with all obligation based on state law within sixty days. See In re Thomas J. Grosso Inv., 457 F.2d 168 (9th Cir. 1972); Good Hope Refineries Inc. v. Benavides, 602 F.2d 998, 1002 n.3 (1st Cir. 1979); Goosen v. Indemnity Ins. Co of North America, 234 F.2d 463 (6th Cir. 1956).

Now that this portion of the bankruptcy statute has been codified in § 108(b), the Code no longer states that § 108(b) is only "for the benefit of the estate." However, Salta has not pointed to anything in the legislative history which would

suggest that, in rewriting this portion of the Code, Congress intended § 108 to be used as a creditor's axe, cutting off a debtor's rights after sixty days.

The absence of any clear legislative intent showing that § 108(b) should be used to cut of a debtor's rights is persuasive. The predominant purpose of a Chapter 13 bankruptcy is to allow regular wage earners, unable to support their debts, an avenue for making affordable payments during the course of a bankruptcy plan and emerge debt-free at the plan's conclusion.  George Bourguignon, Interpretation of Bankruptcy Code § 1322(c)(1), 7 U.C. Davis Bus. L.J. 461 (2007).  Since that is the predominant goal of Chapter 13, if Congress intended for § 108(b) to be used as an axe, cutting off a debtor's rights, then there would be at least some legislative history demonstrating that the purpose § 108(b) had fundamentally changed and was now to act as a cutoff limiting a debtor's rights.  As a result, the legislative history weighs heavily in favor of supporting the Bankruptcy Court's interpretation of the law.

Finally, Salta puts forward a policy argument to support their position.  According to Salta, allowing payments over the redemption period would "cloud every title secured through a foreclosure sale due to the possible filing of a voluntary petition in bankruptcy during the statutory redemption period." Milne, 185 B.R. at 285.  Arguably, this would seriously impede

the tax sale process because there would be a decline of the marketability of certificates of sale which would harm local taxing bodies.[7]

However, a proper understanding of the tax sale process reveals that market conditions will not have any sizable impact on revenue earned by taxing bodies. Under the auctioning process established by Illinois law, delinquent taxes are sold for a set amount; and, as long as there is at least one bidder, the county will always receive the same amount - namely the amount the property owner owes in delinquent taxes plus costs. Investor's bids at the delinquent tax auction are not based on the amount they are willing to pay the county, but on the penalty interest rate they are willing to charge the delinquent property owner. The investor that bids the lowest interest rate

---

[7] Salta also seems to argue that the risk of a property owner declaring bankruptcy is not a risk that would be foreseen by any tax sale investor. This argument is undermined by the popular web site – Wikipedia. While Wikipedia is not considered by this Court as a reliable source for definitive authority, it should be noted that the Wikipedia page discussing "tax lien sales" provides a list of possible pitfalls for investing in delinquent taxes. Among the listed risks is the possibility that the property owner could declare bankruptcy. According to Wikipedia, the bankruptcy court could lower the interest rate that an investor could obtain or could even discharge part of the debt. See, http://en.wikipedia.org/wiki/Tax_lien_sale (last visited on November 10, 2007). While this does not provide any guidance for how to interpret the relevant law at bar, it does demonstrate that at least some delinquent tax investors are aware of the risk that a property owner could declare bankruptcy.

wins the auction.  When there is light demand for delinquent taxes, investors are able to purchase taxes at a higher interest rate.  However, no matter the demand, as long as there is at least one bidder, the county still receives the exact same amount.  The amount of revenue earned by the County will not be affected by the market conditions surrounding tax sales as long as there is at least one investor willing to purchase each delinquent tax.[8]  Accordingly, Salta's policy argument that allowing bankruptcies such as this will drastically reduce tax revenue is without merit.

On the other hand, there is a strong policy interest in allowing homeowners to file for Chapter 13 bankruptcy.  Home ownership is a highly desirable societal policy, which the federal government supports.  Jay A Kroese, <u>Undersecured Residential Mortgage Cramdown Under Chapter 13: Receiving the Attention of Both the Supreme Court and Congress</u>, 18 J. Corp. L. 737, 764 (Summer 1993).  The Bankruptcy Code supports home ownership by allowing homeowners who have defaulted on their home mortgage to cure the default under Chapter 13.  <u>Id</u>.  It does not make sense to provide Chapter 13 bankruptcy protection

---

[8] This Court acknowledges that there are some delinquent taxes that a county is not able to sell no matter the market conditions.  However, such problems generally exist because there is a problem with the underlying property such as an absence of clear title, environmental liabilities, or the amount of delinquent taxes exceeds the value of the property.

19

for a homeowner to protect against a mortgage foreclosure, only to deny the same protection in the context of delinquent real estate taxes and allow a tax buyer to take away that same home.

Accordingly, because of the law as established in Moody, and Bates, as well as the legislative history and the general policy concerns favoring the Bankruptcy Court's decision, this Court agrees that § 108(b) does not act as a bar cutting off a debtor's rights under § 1322 to pay off a tax buyer over the term of a Chapter 13 bankruptcy plan.

Lastly, the Court further agrees with the Bankruptcy Court that relief under 11 U.S.C. § 362(h) would be inappropriate and its decision to deny McKinney's Motion in that regard was warranted.

**IV.**

**CONCLUSION**

IT IS THEREFORE ORDERED that the May 17, 2006 Opinion of the Bankruptcy Court is AFFIRMED.

ENTERED this   4th   day of January, 2008.

                                                  s/Joe Billy McDade
                                                     Joe Billy McDade
                                        United States District Judge